**IN THE UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF TEXAS**
**TYLER DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | **Chapter 11** |
| **THE LINDERIAN COMPANY, LTD.,** | § | |
| Tax ID No. 8556 | § | **Case No. 22-60024** |
| 301 Hollybrook Drive | § | |
| Longview, Texas 75605 | § | **Sub-Chapter V** |
| | § | |
| Debtor. | § | |

### DEBTOR'S CHAPTER 11, SUB-CHAPTER V PLAN OF REORGANIZATION

Dated August 27, 2022

This Subchapter V Plan of Reorganization is presented to you to inform you of the proposed Plan for restructuring the debt through a sale and transfer of substantially all assets of the Debtor to a third-party described herein, and to seek your vote to accept the Plan.

You are encouraged to carefully review the full text of this document, including all exhibits and attachments, before deciding how to vote on the Plan. To assist you in your review, please note that a list of definitions and a section of frequently asked questions appear at the end of this document.

**IN ADDITION TO CASTING YOUR VOTE TO ACCEPT OR REJECT THE PLAN, YOU MAY OBJECT TO CONFIRMATION OF THE PLAN. IF YOU WISH TO OBJECT TO CONFIRMATION OF THE PLAN, YOU MUST DO SO BY [OBJECTION DATE/TIME]. YOUR BALLOT STATING HOW YOU ARE VOTING ON THE PLAN MUST BE RETURNED BY SEPTEMBER 28, 2022 AT 5:00 P.M. CENTRAL TIME. THE BALLOT MUST BE MAILED TO THE FOLLOWING ADDRESS: CURTIS LAW, PC AT 901 MAIN STREET, SUITE 6515, DALLAS, TEXAS 75202. A HEARING ON THE CONFIRMATION OF THE PLAN WILL BE SCHEDULED FOR HEARING BY THE COURT AT THE UNITED STATES BANKRUPTCY COURT FOR THE EASTERN DISTRICT OF TEXAS, TYLER DIVISION LOCATED AT 110 NORTH COLLEGE AVENUE 9th FLOOR TYLER, TEXAS 75702.**

Your rights may be affected by this Plan. You should consider discussing this document with an attorney.

*/s/ Stephanie D. Curtis*
Stephanie D. Curtis
Texas State Bar No. 05286800
Christopher J. Harbin
Texas State Bar. No. 24083134
**CURTIS | LAW PC**
901 Main Street, Suite 6515
Dallas, Texas 75202
Telephone:  214.752.2222
Facsimile:   214.752.0709
Email: scurtis@curtislaw.net
          charbin@curtislaw.net

**COUNSEL FOR
DEBTOR-IN-POSSESSION**

## SUMMARY OF DEBTOR'S PLAN OF REORGANIZATION

The Linderian Company, Ltd. ("Debtor-In-Possession" or "Debtor") proposes the following Plan of Reorganization under Chapter 11, Sub-Chapter V of the Bankruptcy Code, pursuant to 11 U.S.C Sections 1181-1195 (the "Plan"). Under the Plan, the Debtor will transfer operations to a new third-party operator and the facility within which the Debtor operates shall be sold to that third-party operator. The transaction will allow the Debtor to distribute the highest recovery to its creditors with insurance refunds, tax credits, and potential recoupments, as well as from existing cash flow and post-closing revenue to be collected from pre-closing receivables. The third-party operator shall continue to employee the Debtor's current employees and the Debtor's president shall continue in a consulting role. The contemplated structure of this transactions is intended to create a smooth transition of the business to ensure no disruption to the high-quality healthcare currently being provided to the patients residing at the Debtor's skilled nursing home facility. *See* Patient Care Ombudsman's Third Report, concluding paragraph at Doc. No. 189. The Debtor believes the proposed Plan to be in the best interests of its creditors and the estate.

## ARTICLE I

## DEFINITIONS AND CONSTRUCTION OF TERMS

### 1.1  Definitions.

The capitalized terms used herein shall have the respective meanings set forth below:

"Administrative Expense" shall mean any cost or expense of administration of the Bankruptcy Case incurred on or before the Effective Date entitled to priority under section 507(a)(1) and allowed under section 503(b) of the Bankruptcy Code, including Fee Claims and all other claims for compensation or reimbursement of expenses to the extent allowed by the Bankruptcy Court under the Bankruptcy Code, and all fees and charges assessed against the Debtor's estates under Chapter 123 of Title 28 of the United States Code.

"Allowance Date" means the date on which a Claim becomes an Allowed Claim.

"Allowed" when used with respect to any Claim, except for a Claim that is an Administrative Expense, shall mean (l) such Claim to the extent it is not a Contested Claim; (2) such Claim to the extent it may be set forth pursuant to any stipulation or agreement that has been approved by Final Order; or (3) a Contested Claim, proof of which was timely filed with the Bankruptcy Court and (a) as to which no objection was filed by the Objection Deadline, unless such Claim is to be determined in a forum other than the Bankruptcy Court, in which case such Claim shall not become Allowed until determined by Final Order of such other forum and Allowed by Final Order of the Bankruptcy Court, or (b) as to which an objection was filed by the Objection Deadline, to the extent Allowed by Final Order.

"Assets" means, with respect to the Debtor, all of the right, title, and interest in and to property of whatsoever type or nature owned by the Debtor as of the Petition Date, together with property subsequently acquired by the Debtor, and including, but not limited to, the Estate Actions, and all

other property defined in section 541 of the Bankruptcy Code, any proceeds derived therefrom, the available insurance or insurance policies, or any right, claim or cause of action of the estate including without limitation any asset wherever located or pursued.

"Ballot" shall mean the ballot to be used by holders of claims to cast their votes to accept or reject the Plan.

"Balloting Agent" shall mean the Person designated by the Debtor to receive Ballots as reflected on the face of the Ballot. Unless expressly stated otherwise on the Ballots, the Balloting Agent shall be Curtis | Law PC.

"Bankruptcy Case" shall mean the voluntary case commenced under Chapter 11, Sub-Chapter V of the Bankruptcy Code, pursuant to 11 U.S.C Sections 1181-1195 for the Debtor under Case No. No. 22-60024.

"Bankruptcy Code" shall mean the Bankruptcy Reform Act of 1978, as amended, and codified at Title 11 of the United States Code.

"Bankruptcy Court" or "Court" shall mean the Bankruptcy Court unit of the United States District Court for the Eastern District of Texas, Tyler Division, or such other court having jurisdiction over the Bankruptcy Case.

"Bankruptcy Rules" shall mean the Federal Rules of Bankruptcy Procedure, as prescribed by the United States Supreme Court pursuant to section 2075 of title 28 of the United States Code.

"Bar Date" shall mean the final date for filing of proofs of Claims or Interests in the Debtor's Bankruptcy Cases set by the Bankruptcy Court as March 3, 2022 for Debtor, or such other date as may apply to a particular Claim or Interest pursuant to a duly entered order of the Bankruptcy Court.

"Business Day" shall mean any day that is not a Saturday, Sunday, or one of the legal holidays listed in Bankruptcy Rule 9006(a).

"Cash" shall mean legal tender of the United States of America or Cash equivalents.

"Claim" shall have the meaning as set out in section 101 of the Bankruptcy Code.

"Closing Date" shall mean the date upon which the Debtor, Shefa and Vista close the transactions contemplated by the LOI, OTA and PSA as defined herein.

"Collateral" shall mean any property of the Debtor subject to a valid and enforceable Lien to secure the payment of a Claim.

"Confirmation Date" shall mean the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order.

"Confirmation Hearing" shall mean the hearing held by the Bankruptcy Court pursuant to Bankruptcy Code section 1128, and as it may be continued from time to time, on confirmation of the Plan. Unless expressly stated otherwise in the Plan, all references to the Confirmation Hearing or the date of the Confirmation Hearing shall mean the date the Confirmation Hearing commences.

"Confirmation Order" shall mean the order of the Bankruptcy Court confirming this Plan.

"Contested" when used with respect to a Claim, shall mean a Claim against the Debtor (1) that is listed in the Debtor's Schedules as disputed, contingent, or unliquidated, regardless of whether a proof of claim has been filed; (2) as to which an objection has been filed; or (3) that was not timely filed.

"Contested Claims Escrow" shall mean an escrow account created by the Reorganized Debtor as described in Section 10.11 of the Plan.

"Contracts" shall mean all "leases" and "executory contracts" as such terms are used within section 365 of the Bankruptcy Code to which either Debtor was a party as of its respective Petition Date.

"Creditors" shall mean the holders of Allowed Administrative Expenses and/or Allowed Claims.

"Deficiency Amount" shall mean, with respect to a Secured Claim, the amount by which the Allowed Claim exceeds the sum of (1) any set-off rights of the holder of such Claim against Debtor under sections 506 and 553 of the Bankruptcy Code, and (2) the Net Proceeds realized from the disposition of the Collateral securing such Claim, or, if such Collateral is not liquidated to Cash, the fair market value of the interest of the holder of the Claim in the Debtor's interest in the Collateral securing such Claim, as determined by the Bankruptcy Court under section 506 of the Bankruptcy Code and other applicable law.

"Disallowed" when used with respect to a Claim, shall mean a Claim that has been disallowed by Final Order.

"Effective Date" shall mean a Business Day selected by the Debtor after (i) the Confirmation Order has become a Final Order and is not stayed, and (ii) all conditions to the effectiveness of the Plan have been satisfied or waived as set forth herein, and (iii) the Closing Date has occurred. Unless the Court orders otherwise upon cause shown, in no event shall the Effective Date be later than ninety (90) days after the Confirmation Order has become a Final Order.

"Estate Actions" shall mean any and all claims, causes of action, and enforceable rights of the Debtors against third parties, or assertable by the Debtor on behalf of their creditors or the estate, whether brought in the Bankruptcy Court, or any other forum, for recovery or avoidance with respect to:

    (a) Obligations, transfers of property or interests in property, offsets, debt forgiveness, Cash, and other types or kinds of property or interests in property or the value thereof, recoverable or avoidable pursuant to Chapter 5 or other sections of the Bankruptcy Code

or any applicable law, including, without limitation, avoidance and recovery of obligations or transfers under sections 544, 547, 548, and 550 of the Bankruptcy Code and Texas Uniform Fraudulent Transfer Act.

(b) Damages, general or statutory or exemplary (or all) or other relief, including but not limited to actions relating to or based upon—

(i) indebtedness owing to the Debtor based upon, (ii) fraud, negligence, gross negligence, willful injury or misconduct, acts or malice, or any other tort actions, including but not limited to defamation, malicious prosecution, or tortious interference with contract, (iii) breaches of contract, (iv) violations of federal or state securities laws, (v) violations of applicable corporate laws, (vi) breaches of fiduciary or agency duties, (vii) causes of action based on disregard of the corporate form or piercing the corporate veil or other liability theories, (viii) any theory of recovery against a lending institution for any action causing harm to the Debtor, (ix) equitable or legal subordination, (x) malpractice, (xi) appeals of judgments, or (xii) any other action listed in Bankruptcy Rule 7001;

(c) Damages or other relief based upon any other claim of Debtor to the extent not specifically compromised or released pursuant to this Plan or an agreement referred to, or incorporated into this Plan, including, without limitation, claims, damages, or sanctions for violation of the Debtor's automatic stay under section 362 of the Bankruptcy Code by any person; and

(d) Any and all litigation and causes of action listed or referenced in the Schedules, the Plan, or any schedules or attachments thereto.

"Estimation Order" shall mean any order of the Bankruptcy Court estimating a Claim pursuant to Bankruptcy Rule 3018 or pursuant to section 502(c) of the Bankruptcy Code.

"Facility" shall mean the Debtor's 115-bed skilled nursing facility (together with furniture, fixtures, and equipment) commonly known as "Summer Meadows" located at 301 Hollybrook Drive, Longview, TX 75605, used and occupied by Debtor under the Lease.

"Fee Application" shall mean an application of a Professional Person under section 330, 331, or 503 of the Bankruptcy Code for allowance of compensation and reimbursement of expenses in the Bankruptcy Case.

"Fee Claim" shall mean a Claim against the Debtor under section 330, 331, or 503 of the Bankruptcy Code for allowance of compensation and reimbursement of expenses in the Chapter 11 case.

"Final Decree" means the final decree entered by the Bankruptcy Court on or after the Effective Date and pursuant to Bankruptcy Rule 3022.

"Final Order" shall mean (l) an order as to which the time to appeal, petition for certiorari or move for reargument, rehearing, reconsideration, new trial, or to alter or amend findings or judgment has expired and as to which no appeal, petition for certiorari, or other proceedings for reargument, rehearing, reconsideration, new trial, or to alter or amend findings or judgment shall then be pending or (2) in the event that an appeal, writ of certiorari, reargument, rehearing, reconsideration, new trial, or motion to alter or amend findings or judgment thereof has been sought, such order shall have been affirmed by the highest court to which such order was appealed, or certiorari has been denied or from which reargument, rehearing, reconsideration, new trial, or motion to alter or amend findings or judgment was sought, and the time to take any further appeal, petition for certiorari or move for reargument, rehearing, reconsideration, new trial, or to alter or amend findings or judgment shall have expired, provided, however that (i) no order shall fail to be a Final Order solely because of the possibility that a motion pursuant to Rule 60 of the Federal Rules of Civil Procedure may be filed with respect to such order, and (ii) if such order is the Confirmation Order, subsection (2) supra shall only apply if a stay of the Confirmation Order is in effect.

"General Unsecured Claim" shall mean any Claim against the Debtor that is not a Secured Claim, an Administrative Expense, a Priority Unsecured Claim, a Penalty Claim, a Disallowed Claim, or a Subordinated Claim, and is not subject to a prepetition guarantee by any non-debtor.

"Insider" shall have the meaning set forth in section 101(31) of the Bankruptcy Code.

"Interest" shall mean any "equity security" as defined in section 101(16) of the Bankruptcy Code.

"IRS" shall mean the United States Internal Revenue Service.

"Landlord" shall mean Shefa Healthcare, LLC ("Shefa") which owns that certain real property located at 301 Hollybrook Drive, Longview, TX 75605.

Lease" shall mean the Debtor's operating lease with Shefa to occupy and operate the Debtor's skilled nursing facility and related furniture, fixtures, and equipment (also leased from Shefa) located at 301 Hollybrook Drive, Longview, TX 75605.

"Letter of Intent" shall mean the executed Letter of Intent approved and acknowledged by the Debtor and entered into by and between the Landlord (as "Seller") and Vista Pacific, LLC ("Vista") (as "Purchaser") on or about June 21, 2022 to transfer the operations, real estate, fixtures and tangible personal property located at the Debtor's Facility, subject to the Court's approval and attached hereto and incorporated herein by reference as Exhibit "1."

"Lien" shall have the meaning set forth in section 101(37) of the Bankruptcy Code.

"Net Proceeds" shall mean amounts in Cash actually received and retained by the Debtor as a result of liquidation of Assets or litigation of Estate Actions, in either case after reduction for costs of collection, including all attorneys', accountants', appraisers', brokers', consulting experts' and

testifying experts', expert witnesses', and other professionals' fees and expenses and costs of court, and also after reduction of any and all non-refundable advances described herein.

"New Operator" shall mean the new third-party operator to whom operation of the Facility is to be transferred pursuant to the OTA, defined as the "Transferee" under the OTA.

"Objection Deadline" shall mean the date by which objections to Claims shall be filed with the Bankruptcy Court and served upon the respective holders of each of the Claims as provided in Article X of the Plan.

"Operations Transfer Agreement" shall mean an Operations Transfer Agreement ("OTA") between the Debtor and New Operator contemplated by the Letter of Intent whereby the Debtor's operations shall be transferred to New Operator, subject to Bankruptcy Court approval, in substantially the form attached hereto and incorporated herein by reference as Exhibit "2" or as amended.

"Penalty Claim" shall mean Claims for penalties or punitive damages, including Claims denominated as "interest" or "liquidated damages" that the Bankruptcy Court determines to be punitive in nature.

"Person" means and includes natural persons, corporations, limited partnerships, general partnerships, joint ventures, trusts, unincorporated organizations, or other organizations, irrespective of whether they are legal entities, governments and agencies and political subdivisions thereof or other entities.

"Petition Date" shall mean January 19, 2022 for the Debtor, constituting the date of filing of the Chapter 11, Sub-Chapter V petition by the Debtor under Chapter 11, Sub-Chapter V of the Bankruptcy Code.

"Plan" shall mean this Subchapter V Plan of Reorganization either in its present form or as it may hereafter be altered, amended or modified from time to time.

"Plan Documents" shall mean the documents that aid in effectuating the Plan as specifically identified as such herein or as attached as exhibits hereto, which will be substantially in the respective forms filed by the Debtor with the Bankruptcy Court prior to the conclusion of the Confirmation Hearing, and shall specifically include the Plan, , Plan Projections, Schedules, LOI, OTA, PSA and all of their attachments.

"Plan Participants" shall mean the Debtors, the Reorganized Debtors, and members, managers, officers, employees and advising professionals of all the preceding, all as of and after the Confirmation Date.

"Priority Tax Claim" shall mean a Claim of a governmental unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

"Priority Unsecured Claim" shall mean any Claim (other than an Administrative Expense) to the extent entitled to priority in payment under section 507(a) of the Bankruptcy Code, not including priority tax Claims.

"Professional Person" shall mean any person retained or to be compensated pursuant to section 327, 328, 330, 331, 503(b) or 1103 of the Bankruptcy Code.

"Pro Rata Share" shall mean the proportion that the amount of an Allowed Claim in a particular class of Claims bears to the aggregate amount of all Claims in such class of Claims, including Contested Claims, but not including Disallowed Claims.

"Purchase and Sale Agreement" shall mean a Purchase and Sale Agreement ("PSA") contemplated by the Letter of Intent between Landlord as Seller and Vista or its assignee as Purchaser, in substantially the form attached hereto and incorporated herein by reference as Exhibit "3" or as amended.

"Purchaser" shall mean Vista or its assignee as the purchaser of the Facility Real Property, defined as the "Purchaser" in the Purchase and Sale Agreement.

"Reorganized Debtor" shall mean the Debtor, as reorganized on and after the Effective Date.

"Representatives" shall mean any principal, agent, responsible party, officer, manager, member, financial advisor, attorney, accountant, or other professional persons of the Debtor, including but not limited to Curtis | Law PC and any of its employees, attorneys, accountants, professionals, assistants, or contractors.

"Schedules" shall mean the schedules of assets and liabilities and the statement of financial affairs filed by the Debtor as required by section 521 of the Bankruptcy Code and Bankruptcy Rule 1007, as such schedules and statements have been or may be supplemented or amended.

"Secured Claim" shall mean a prepetition Claim against the Debtors secured by a Lien on property of the Debtors, which Lien is valid, perfected, and enforceable under applicable law, is not subject to avoidance under the Bankruptcy Code or other applicable non-bankruptcy law, and is duly established in the Bankruptcy Case, but only to the extent of the value of the Collateral that secures payment of such Claim.

"Subordinated Claim" shall mean any Claim against the Debtors (1) subordinated by contract or by order of the Bankruptcy Court to the right of payment of General Unsecured Claims, or (2) that would be paid pursuant to Bankruptcy Code section 726(a)(2)(C), (a)(3), (a)(4) or (a)(5), if this Bankruptcy Case were a case under chapter 7 of the Bankruptcy Code.

"Voting Claim" shall mean a Claim of a holder that is (i) Allowed, (ii) impaired, and (iii) receiving or retaining property on account of such Claim pursuant to the Plan.

"Voting Deadline" shall mean September 28, 2022 by 5:00 p.m. Central Prevailing Time, the date and time set by the Bankruptcy Court by which Ballots for accepting or rejecting the Plan must be received by the Debtor's counsel.

"Withheld Distribution Amount" shall have the meaning set forth in section 10.11 of the Plan.

## 1.2 Interpretation.

For purposes of the Plan, (i) any reference in the Plan to an existing document or exhibit filed or to be filed means that document or exhibit as it may have been or may be amended, modified, or supplemented; (ii) unless otherwise specified, all references in the Plan to articles and exhibits are references to articles or exhibits in the Plan; (iii) captions and headings contained in the Plan are inserted for convenience and reference only, and are not intended to be part of or to affect the interpretation of the Plan; (iv) wherever appropriate from the context, each term stated in either the singular or the plural shall include the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and neuter gender; and (v) the rules of construction outlined in section 102 of the Bankruptcy Code and in the Bankruptcy Rules shall apply to the Plan.

## 1.3    Application of Definitions and Rules of Construction Contained in the Bankruptcy Code.

Words and terms defined in section 101 of the Bankruptcy Code shall have the same meaning when used in the Plan, unless a different definition is given in the Plan. The rules of construction contained in section 102 of the Bankruptcy Code shall apply to the construction of the Plan.

## 1.4 Other Terms.

The words "herein," "hereof," "hereto," "hereunder," and others of similar import refer to the Plan as a whole and not to any particular section, subsection, or clause contained in the Plan.

## 1.4 Integration Clause.

This Plan is a complete, whole, and integrated statement of the binding agreement between the Debtor, the Creditors, the Interest holders, and other parties-in-interest upon the matters herein.

## 1.5 Plan Documents.

The Plan Documents are incorporated into and are part of the Plan as if set forth in full herein.

## ARTICLE II

## HISTORY OF DEBTOR

**2.0     Nature of Debtor's Business and History of Business Operations of the Debtor**

Debtor operates a 115-bed skilled nursing facility (SNF) founded in 2004 and located in Longview, Texas under the name Summer Meadows, which facility and related furniture, fixtures, and equipment is leased from Shefa under the Lease. Summer Meadows has approximately 67 resident patients. The Debtor previously reorganized under Chapter 11 from a filing in January 2016 and has been operating successfully for the last several years after its initial exit from bankruptcy. However, the recent COVID-19 pandemic has dramatically and negatively affected the Debtor's financial strength. The Debtor lost a large portion of its patients over the last two years due to COVID and, because of the new COVID restrictions, new patients (particularly private pay patients) are not coming in at the rate previously experienced by the Debtor. As the Debtor has emerged from the COVID pandemic, Debtor has steadily increased the number of patients it serves, as well as the revenue it collects.

The Debtor receives revenue for its treatment of patients through Medicare, Medicaid, and private pay. The current mix is 20 patients using Medicare, 21 using Medicaid, and 26 private pay patients. The Debtor collects on these accounts receivable via third-party, in order to efficiently manage and collect on these accounts. However, these governmental payments became untimely in the months preceding the Debtor's bankruptcy filing despite the Debtor's steady billings, causing a lag in revenue.

**2.1     Events Leading to the Filing of the Debtors Bankruptcy Case**

This reduction in revenue caused the Debtor to fall behind on its payroll tax obligations to the IRS resulting in tax liens being placed on its receivables. On January 19, 2022, the Petition Date the Debtor filed its voluntary petition for relief with this Court under Subchapter V of Chapter 11 of the Bankruptcy Code. The Debtor continues to manage and operate its business as a debtor-in-possession pursuant to section 1184 of the Bankruptcy Code.

**2.2     Significant Events During the Bankruptcy Case**

On January 24, 2022, the U.S. Trustee appointed Mark A. Weisbart of Hayward, PLLC as the Subchapter V Trustee in this Chapter 11 Case, *see* Docket No. 20. On February 11, 2022, the U.S. Trustee appointed Susan N. Goodman, R.N., J.D., of Pivot Health Law, LLC as Patient Care Ombudsman ("PCO"), *see* Docket. No. 86. No other trustee, official committee of unsecured creditors or other statutory committee has been appointed in this Chapter 11 Case.

As a result of the tax liens, the Debtor received a Proposal to Deny License Renewal Application on February 14, 2022, from the Texas Health and Human Services Commission ("HHSC"). The Debtor submitted a timely notice of its appeal to the HHSC decision to potentially deny renewal of Mr. Sechrist's license to operate the facility due to the IRS tax liens. Importantly, the denial appears to be solely based on the unpaid payroll taxes and in no way caused by any

deficiencies in Debtor's care and treatment of its residents. All reports from the PCO indicate that resident care remains at a high level. A pre-hearing conference before the Texas State Office of Administrative Hearings regarding the February 14th notice for non-renewal of license is set for August 30, 2022. At that hearing, the Debtor intends to present its timeline for the transfer to Vista, as a new independent operator. It is anticipated presentation of an acceptable timeline at the appeal hearing will resolve the pending licensing issue, as once the operations transition has been completed, Mr. Sechrist's license status will be irrelevant (as he will no longer be in control of operations), making any potential HHSC decision moot.

Three status reports have been filed, three status conferences have been held, and the parties have attended numerous hearings in this case. On March 9, 2022, the Court held a status conference on the Debtor's reorganization efforts pursuant to 11 U.S.C. § 1188. On April 8, 2022, the Court held an emergency status conference per a request filed by the Texas Health and Human Services Commission ("HHSC"). On April 22, 2022, a status conference was held regarding the Debtor's default on its Cash Collateral agreement with the IRS. The Debtor is currently in compliance with the Cash Collateral Order. Other hearings have been held in this case concerning cash collateral and other first-day and second-day matters.

In addition to the various hearings in this case, the Debtor has had several meetings and calls with its key constituents. An initial plan-related meeting was held in person and via zoom at the offices of the Sub-V Trustee. Participants included the Debtor, its counsel, the Sub-V Trustee, Mr. Weisbart, counsel for the IRS, counsel for HHSC, and the Debtor's Landlord Shefa and its counsel.

After making demand under section 549 of the Bankruptcy Code for return of an unauthorized postpetition transfer, on April 21, 2022 Debtor's counsel received a wire transfer from the Debtor's factoring company, Whetstone Holdings, LLC returning the amount of $18,375.00 to the Debtor. Debtor's counsel in turn transferred those funds to the Debtor, who upon receipt immediately transferred those funds to the Internal Revenue Service/Department of Justice (the "IRS") toward payment of its post-petition payroll tax obligations. This unauthorized transfer of funds, however, resulted in a cash shortfall causing the Debtor to make a late payment on its payroll tax obligations, for which it had to pay penalties and interest.

After making demand under section 549 of the Bankruptcy Code for return of an unauthorized postpetition transfer, on April 22, 2022, Debtor's counsel received a wire transfer from another of the Debtor's factoring companies, Delta Bridge Funding, LLC returning the amount of $37,968.68. Debtor's counsel in turn transferred those funds to the Debtor, who upon receipt immediately transferred those funds to the IRS toward payment of its post-petition payroll tax withholding obligations. This unauthorized transfer of funds, however, resulted in a cash shortfall causing the Debtor to make a late payment on its payroll tax obligations, for which it had to pay penalties and interest.

After making a series of demands under section 549 of the Bankruptcy Code for return of an unauthorized postpetition transfer, on April 25, 2022, Debtor's counsel finally received a wire transfer from the Debtor's factoring company, Fox Capital Group Inc. returning the amount of

$71,750.00. Debtor's counsel in turn transferred those funds to Debtor, who upon receipt immediately transferred those funds the IRS toward payment of its post-petition payroll tax obligations. This unauthorized transfer of funds, once again, resulted in a cash shortfall causing the Debtor to make a late payment on its payroll tax obligations, for which it had to pay penalties and interest to remain in compliance with its Cash Collateral Order

The Debtor has made all first quarter post-petition payroll withholding tax obligations with the IRS, including penalties and interest. Regarding the second and third quarters of 2022, the Debtor has been making its payroll tax deposits as required under the Cash Collateral Order, as well as has been sending through counsel for the IRS its semi-monthly payroll and payroll tax withholding records.

Susan Goodman, the Patient Care Ombudsman ("PCO"), represented in her report filed on June 21, 2022, at Docket No. 189, that:

> PCO engaged in two random resident interviews. Both were glowing. One resident reported moving to Summer Meadows after receiving what was described as poor care at another local, long-term-care facility. … Operationally, in terms of staffing, supplies, and resident feedback Debtor's operation appeared stable during PCO's brief, third site visit. Per PCO's request, the Debtor has been confirming that cash flow allows for payroll and payroll tax payments a few days in advance of the bi-monthly scheduled payroll days of the 5th and 20th each month. The main stressor appears to be the uncertainty surrounding whether a desirable strategic partner is forthcoming and what happens in the alternative.

The executed LOI, dated June 27, 2022, between Vista and Shefa, along with the PSA and OTA provide for a purchase by Vista or its assignee from Shefa of the real estate, fixtures and tangible personal property of Summer Meadows, and a transfer of the operations from the Debtor to New Operator. This transaction, in essence, would transfer operations of Summer Meadows away from the Debtor and into the hands of New Operator. It is anticipated that Debtor's managing member, Greg Sechrist, will be retained by New Operator in a consulting and advising role in order to facilitate a smooth transition of operations. The transaction contemplated by the LOI, PSA and OTA will allow for a smooth and safe transfer of the facilities and operations with little to no disruption to the healthcare of the patients, and is in their best interests, as well as in the best interests of the Debtor's estate and its creditors.

The above-described transaction will leave all pre-Closing receivables in the possession of the Debtor, reduce the administrative claim of Shefa, eliminate through mitigation the rejection claim of Shefa and solve the licensing issue in order that the Debtor may continue to collect and distribute proceeds to satisfy the claims of its professionals and other administrative claims, and make payments toward its other obligations to priority, secured and unsecured creditors.

The Debtor employed Hiring Incentives, Inc. in order to finalize the Debtor's 941x's for the Employee Retention Tax Credit it is owed, the funds of which will be used to largely reduce

existing secured tax obligations with the IRS. The Debtor anticipates receiving those funds by the end of 2022 but cannot be certain.

The Debtor is current on its insurance obligations as required under the Cash Collateral Order and expects a refund at Closing.

## 2.3    Debtor's Assets

Debtor has approximately $143,000 in assets that could be sold, but at a far less value in liquidation. These do not include ownership of the real estate leased by the Debtor within which it operates the SNF or the fixtures in the Facility, including patient beds. These assets consist of tangible personal property such as current inventory, office equipment, and other furniture throughout the Facility. These assets are addressed more fully in the Liquidation Analysis attached hereto and incorporated herein as Exhibit "4."

## 2.4    Debtor's Liabilities

The Debtor's liabilities are listed on its Schedules and Statement of Financial Affairs, *see* Docket No. 77. The Debtor's liabilities are also discussed in its Plan Projections, attached hereto and incorporated herein as Exhibit "5."

## 2.5    Debtor's Current Financial Condition

The Debtor's current financial condition is set forth on the Financial Packet containing the Debtor's most recent Balance Sheet, Statement of Operations and its Federal Income Tax Return for 2021, attached hereto as Exhibit "7" and the Ten (10) Month Plan Projections, attached hereto as Exhibit "5." The Debtor's current financial condition is also discussed in its Monthly Operating Reports.

The Debtor's May Operating Report, filed on June 27, 2022 at Docket No. 199, shows a positive cash flow of $25,000. The Debtor's June 2022 Monthly Operating Report filed on August 2, 2022 at Docket No. 229, shows a positive cash flow. And, the Debtor's July 2022 Monthly Operating Report filed on August 24, 2022, shows a positive cash flow. *See* Debtor's May, June and July Monthly Operating Reports attached hereto and incorporated herein as Exhibit "6."

## 2.6    Projected Recovery of Avoidable Transfers

The Debtor has not yet completed its investigation with regard to prepetition transactions. The Debtor anticipates completing its investigation prior to the Closing. If you received a payment or other transfer of property within 90 days of bankruptcy, the Debtor may seek to avoid such transfer.

## 2.7    Legal Structure and Future Ownership of the Debtor

Greg Sechrist is the Managing Partner and President of the Debtor. The Debtor's operations and tangible assets are expected to be transferred to Purchaser pursuant to the OTA, attached hereto as Exhibit 2. On the Closing Date, Debtor's managing partner and president, Greg

Sechrist, will remain as Managing Partner of the Debtor, and will continue to exercise all corporate control of the Debtor. It is also anticipated that Mr. Sechrist will be retained by New Operator in a consulting role. Debtor believes that this is in the best interests of the estate and its creditors as Mr. Sechrist maintains good relationships with both employees and patients, which has made Summer Meadows a well-regarded SNF with a reputation for high-quality patient care.

Subject to the terms of the OTA, Mr. Sechrist shall collect and "true-up" all pre-Closing collection of receivables, and make Plan payment distributions, post-Effective Date and post-Closing. This will eliminate the post-confirmation expenses of a Plan agent or Trustee and as such, allow the Reorganized Debtor to retain more in proceeds to go toward creditors. Mr. Sechrist will make timely Plan payments, through the Private Pay, Medicaid and Medicare payments collected for pre-Closing Dates of service (pursuant to the OTA, the Debtor or Reorganized Debtor as appropriate will retain the right to all pre-Closing receivables, and the New Operator will have the right to collect all post-Closing receivables), and monitor refunds, credits and recoupments, if any, once again, saving the cost of a Plan agent and, instead, adding value to the Plan.

Upon confirmation of the Plan under section 1191(a) the service of the Subchapter V trustee shall terminate once the Plan has been substantially consummated. Within fourteen (14) days after the Plan has been substantially consummated, the Debtor shall file with the Court and serve on the Trustee, the United States Trustee and all parties in interest notice of such substantial consummation.

In aiming toward substantial consummation of the Plan, the Debtor and New Operator will submit an application for change of ownership ("CHOW") to the HHSC requesting expedited approval of same concurrently with the pre-Closing timeline for the OTA. The parties will endeavor to submit the CHOW application with all required items at least 30 days before the anticipate date of change of ownership. The HHSC is aware of the status of this case and has represented to the parties it will act as quickly as possible. Under §554.210 of the Texas Administrative Code, a 90-day temporary license will be issued to the applicant (proposed new operator) after verification of certain requirements, followed by the process necessary to issue a regular three-year license.

As to the denial of renewal/appeal process, the current facility license remains active while the appeal process proceeds. The HHSC hearing on August 31, 2022 is a pre-hearing conference where it is anticipated, based on the progression of the transaction between Vista, Shefa and the Debtor, the parties will be able to secure a timeline from the Texas State Office of Administrative Hearings ("SOAH") presiding judge that would provide the flexibility needed to allow for Closing. Thus, it is anticipated that the timeline for the appeal process will be such that the contemplated transaction will be allotted adequate time needed to close before there is a licensing impediment. The Facility remaining licensed through the Closing, and HHSC approving issuance of a license to New Operator are conditions to Closing of the OTA and PSA.

The Facility and fixtures will be sold by Landlord to Purchaser pursuant to the PSA on the Closing Date. Thus, the Facility and operations will be owned by Purchaser and New Operator after the Closing Date. This sale of the Facility will curtail the Debtor's administrative rent burdens and eliminate through mitigation a lease rejection claim.

**ARTICLE III**

**LIQUIDATION ANALYSIS AND DEBTOR'S PLAN PROJECTIONS**

**3.0**   **Liquidation Analysis**.

To confirm the Plan, the Court must find that all creditors and equity interest holders who do not accept the Plan will receive at least as much under the Plan as such claim and equity-interest holders would receive in a chapter 7 liquidation. The liquidation analysis required by 11 U.S.C. § 1190 is attached to the Plan as Exhibit "4." The Debtor's estimated liquidation analysis demonstrates that all creditors will receive at least as much under the proposed Plan than in a chapter 7 liquidation.

**3.1**   **Ability to Make Future Plan Payments and Operate Without Further Reorganization**

The Plan proposes to pay creditors with cash on hand, cash flow from operations and future income from all pre-Closing receivables of the Debtor, to include all revenue, receivables and collections therefrom; all refunds and credits to which it is entitled, including its Employee Retention Credit to be remitted by the IRS, whenever received. This Plan shall provide distributions only to Allowed Claims; nothing within this Plan shall provide for the Allowance of any Claim.

The Debtor will have enough cash over the life of the Plan to make the required Plan payments and operate the Debtor's business through the Effective Date. Projections that support the Debtor's ability to make all payments required by the Plan are attached to the Plan and incorporated herein by reference as Exhibit "6," pursuant to 11 U.S.C. § 1190. The Plan Proponent has provided recent financial information to include most recent balance sheet, statement of operations, cash flow statement and its most recent Federal Income Tax Return as Exhibit "7."

The Debtor's financial projections show that the Debtor will have projected income for the period described in § 1191(c)(2) of $3,366,238.48. The final Plan payment is expected to be paid within ten (10) months. The Debtor's 10-month Projections are largely contingent upon receipt of the Employee Retention Credit ("ERC"), which is expected to be received by year end, but could come later. The Debtor has confirmed with its professionals the amount of the ERC to be received will be $2,106,000. But the timing of receipt is uncertain.

The Debtor is requesting the IRS waive penalties and interest on its priority and secured claims due to circumstances beyond the Debtor's control, to include negative effects on its operations and cash flow due to the COVID-19 Pandemic and untimely payments received from the government under its Medicaid and Medicare contracts. The Debtor's Projections provide for payment in full of the tax portion of the Priority IRS Claim and the Secured IRS Claim.

The Projections also contemplate a reduction in the administrative rent claim of Shefa based on preliminary discussions had with Shefa's counsel and the contemplated transaction with

Purchaser. The Projections contemplate payment in full to Shefa for its postpetition priority loan, reduced treatment of Shefa's postpetition rent claim, and an approximate 5% pro rata distribution to Shefa on its prepetition claim, along with other general unsecured creditors.

The Projections set forth an approximate 4% pro rata distribution to the Debtor's factors, and classify them separately from other general unsecured creditors as they are substantially similar, and subject to subordination and avoidance of their purported prepetition liens for damages to the Debtor based on unauthorized postpetition transfers that had to be clawed back and recovered.

## ARTICLE IV

## THE PLAN

**4.0**      The Debtor's Plan must describe how its Creditors will be paid. Certain Claims are entitled to specific treatment under the Bankruptcy Code and are not placed in a class for purpose of payment. For example, Administrative Expenses and Priority Tax Claims are not classified.

As required by the Code, the Plan places Claims and Equity Interests in various classes and describes the treatment each class will receive. The Plan also states whether each class of Claims or Equity Interests is impaired or unimpaired. A Claim or Equity Interest can be impaired if the Plan alters the legal, equitable or contractual rights to which the Claimants are otherwise entitled. If the Plan is confirmed, each Creditor's recovery is limited to the amount provided in the Plan.

Only Creditors in classes that are impaired may vote on whether to accept or reject the Plan, and only Creditors holding Allowed Claims may vote. A class accepts the Plan when more than one-half (1/2) in number and at least two-thirds (2/3) in dollar amount of the Allowed Claims that actually vote, vote in favor of the Plan. Also, a class of Equity Interest holders accepts the Plan when at least two-thirds (2/3) in amount of the allowed Equity Interest holders that actually vote, vote in favor of the Plan. A class that is not impaired is deemed to accept the Plan.

**4.1**      **CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS**

   **A.  Unclassified Claims.**

Certain types of Claims are automatically entitled to specific treatment under the Code. For example, Administrative Expenses and Priority Tax Claims are not classified. They are not considered impaired, and holders of such Claims do not vote on the Plan. They may, however, object if, in their view, their treatment under the Plan does not comply with that required by the Code. As such, the Plan does not place the following Claims in any class:

   **1.  Administrative Expenses**

The Debtor must pay all Administrative Expenses in full. If an Administrative Expense is disputed, the Bankruptcy Court must determine the validity and amount of the Administrative Expense, or in other words, "allow" the Administrative Expense. Any Administrative Expense that is undisputed and is due and owing on the Confirmation Date must be paid in accordance with this Plan, or upon such other terms as agreed upon by the Debtor and the Administrative Claimant or

court order. If the Administrative Expense is disputed, payment will be made after the Administrative Expense is allowed by the Bankruptcy Court.

There are several types of Administrative Expenses, including the following:

1. If the Debtor trades in the ordinary course of business following its filing of the Chapter 11 Case, Creditors are entitled to be paid in full for the goods or services provided. This ordinary trade debt incurred by the Debtor after the Petition Date will be paid on an ongoing basis in accordance with the ordinary business practices and terms between the Debtor and its trade Creditors.
2. If the Debtor received goods it has purchased in the ordinary course of business within 20 days before the Petition Date, the value of the goods received is an Administrative Expense.
3. Administrative Expenses also include any post-petition fees and expenses allowed to professionals, including the allowed claim of the Trustee for fees and/or reimbursements, and for attorneys and accountants employed upon Bankruptcy Court authority to render services to the Debtor during the course of the Chapter 11 cases. These fees and expenses must be noticed to Creditors and approved by the Bankruptcy Court prior to payment.

**2. Priority Tax Claims.**

Priority Tax Claims are unsecured income, employment, and other taxes described by § 507(a)(8) of the Code. Unless the holder of such a § 507(a)(8) Priority Tax Claim agrees otherwise, it must receive the present value of such Claim, in regular installments paid over a period not exceeding 5 years from the order of relief. Each holder of a Priority Tax Claim will be paid as set forth in the Projections at Exhibit "5."

As provided in section 1123(a)(l) of the Bankruptcy Code, Administrative Expenses and Priority Tax Claims against the Debtor shall not be classified for purposes of voting or receiving distributions under the Plan. Rather, all such Claims shall be treated separately as unclassified Claims on the terms set forth in the Plan Projections attached at Exhibit "5."

**B. Classes of Claims and Interests.**

The Plan classifies the Claims against and Interests in the Debtors as follows:

**Linderian Classes:**

Class 1: Secured Tax Claim of the IRS

Class 2: Secured Tax Claim of Gregg County

Class 3: Secured Non-Tax Claim

Class 4: Priority Non-Tax Unsecured Claim of Shefa

**DEBTOR'S PLAN OF REORGANIZATION**                                        Page **18** of 43

Class 5: General Unsecured Claims

Class 6: General Unsecured Factor Claims

Class 7: Partnership Interests

**4.2 Claims May Be in More Than One Class.**

An Allowed Claim is part of a particular Class only to the extent that the Allowed Claim qualifies within the definition of that Class and such Claim shall be part of a different Class to the extent that the remainder of the Claim qualifies within the description of a different Class.

## ARTICLE V

## IDENTIFICATION OF IMPAIRED/VOTING CLASSES

**5.1 Impaired Classes of Claims and Interests.**

All Classes of Claims and Interests are impaired under the Plan.

**5.2 Impairment Controversies.**

If a controversy arises as to whether any Claim or Equity Interest or any class of Claims or class of Interests is impaired under the Plan, the Bankruptcy Court shall rule at the appropriate time on any such dispute.

**5.3 Classes Entitled to Vote.**

All Classes of Claims and Interests are impaired under the Plan and are entitled to vote to accept or reject the Plan.

**5.4 One Vote per Holder.**

If a holder of a Claim holds more than one Claim in any one Class, all Claims of such holder in such Class shall be aggregated and deemed to be one Claim for purposes of determining the number and amount of Claims in such Class voting on this Plan.

## ARTICLE VI

## PROVISIONS FOR TREATMENT OF CLAIMS AND EQUITY INTERESTS UNDER THE PLAN

The classes of Claims against and the Interests in the Debtor shall be treated under the Plan as set forth below:

### 6.1 Secured Claims.

Each holder of an Allowed Secured Claim will be treated in a separate class and shall receive, as soon as practicable after the Effective Date (or, if later, the Allowance Date), the following treatment on account of its Allowed Secured Claim. To the extent any disputes concerning the validity or priority of Liens against the Collateral securing or purporting to secure any Secured Claim in this Class have not been resolved before the Confirmation Hearing, such disputes shall be resolved by the Bankruptcy Court upon notice and hearing.

### 6.1(a) Class 1 - Secured Tax Claim of the IRS.

The IRS, as holder of the Class 1 Allowed Secured Tax Claim of the IRS, shall retain its full rights and liens in the property of the Reorganized Debtor to the extent of its Allowed Secured Tax Claim until its Allowed Secured Tax Claim has been paid in accordance with the Plan, as set forth on the Plan Projections attached hereto as Exhibit "5." The Allowed Class 1 Secured Tax Claim of the IRS shall receive, in full satisfaction of such Claim, regular installment payments, payable in regular monthly Cash installments to begin in December, 2022, in the amounts set forth in the Payment Schedule contained on Debtor's Plan Projections, attached as Exhibit "5." The Debtor calculates that the foregoing payment schedule will result in payment in full of the tax portion of the Allowed Class 1 Secured Tax Claim without payment of penalties or interest. After receipt of the ERC proceeds, anticipated to be received by year end, the Debtor may make accelerated payments to the IRS within the Debtors' reasonable business judgment and without penalty.

All payments made under this paragraph shall be sent to the IRS through Electronic Funds Transfer ("ETF") . All payments made under this paragraph shall be applied toward the payment of the IRS's Allowed Secured Claim. .

### 6.1(b) Class 2 Secured Tax Claim of Gregg County.

Each holder of a Class 2 Allowed Secured Tax Claim payable to a taxing authority for ad valorem taxes for tax years prior to 2022 shall retain its full rights and liens to the extent of its Allowed Secured Tax Claim until its Allowed Secured Tax Claim has been paid in full. Payment on Class 2 Allowed Secured Tax Claims shall be made in full by January 31st of the year subsequent to the relevant tax year. Taxes for year 2022 and after shall be paid in the ordinary course of business. However, the value of the Debtor's property is insufficient to adequately secure the Gregg County Tax Claim. The Gregg County Tax Claim shall be paid as a Priority Tax Claim in full on the Effective Date.

**6.1(c) Class 3 Secured Non-Tax Claims.**

The Debtor is unaware of any Class 3 Secured Non-Tax Claims. Unless otherwise determined, there shall be no distribution to Class 3.

**6.2 Class 4 – Priority Non-Tax Unsecured Claims.**

The Debtor's Priority Non-Tax Claim is held by Shefa, pursuant to a postpetition Court approved loan in the amount of $125,000. This Allowed Class 4 Claim shall be paid in full in four (4) equal monthly installments, beginning on the month after the Effective Date, pursuant to the Payment Schedule contained on the Debtor's Projections attached as Exhibit "5." This claim is separate and apart from Shefa's prepetition claim and Shefa's postpetition rent claim for Shefa's postpetition occupancy of the Facility and use of Shefa's personal property.

**6.3 Class 5 – General Unsecured Claims.**

Allowed General Unsecured Claims in Class 5, if and when Allowed, shall be treated as follows in full satisfaction of any and all Claims as hereinafter provided. Linderian will pay a total of approximately _5% of each Allowed General Unsecured Claim under Class 5, whose pro rata distributions shall be paid by Linderian in the Allowed Amounts of such Claims as set forth in the attached Payment Schedule.

Upon completion of the Payment Schedule, and in the event that Linderian holds excess funds available for distribution, Linderian may make additional pro rata distributions on behalf of Allowed General Unsecured Claims under Class 5 and Allowed General Unsecured Factor Claims under Class 6 from an amount not to exceed $100,000.

No Class subordinate to or junior to Classes 5 and 6 will receive any cash distribution unless Allowed Class 5 and 6 Claims are paid in full.

**6.4 Class 6 – General Unsecured Guaranteed Claims.**

Holders of General Unsecured Factor Claims are substantially similar and shall have their Claims classified in Class 6. Allowed General Unsecured Factor Claims in Class 6, if and when Allowed, shall be treated as follows in full satisfaction of any and all Claims as hereinafter provided. Linderian will pay a total of approximately four (4%) of each Allowed General Unsecured Factor Claim under Class 6, whose pro rata distributions shall be paid by Linderian as set forth in the attached Payment Schedule at Exhibit "5." Upon completion of the Payment Schedule and in the event that Linderian holds excess funds available for distribution, Linderian may make additional pro rata distributions on behalf of Allowed General Unsecured Claims under Class 5 and Allowed General Unsecured Factor Claims under Class 6 from an amount not to exceed $100,000. No Class subordinate to or junior to Classes 5 and 6 will receive any cash distribution unless Allowed Class 5 and 6 Claims are paid in full.

**6.5 Class 7 – Partnership Interests.**

Class 7 Interests in the Debtor shall be retained but shall receive no Cash distributions or Cash dividends whatsoever on account of such Interests.

## ARTICLE VII

## PROVISIONS FOR TREATMENT OF
## UNCLASSIFIED CLAIMS UNDER THE PLAN

**7.1 Treatment of Administrative Expenses.**

All Administrative Expenses against the Debtors shall be treated as follows:

(a) Time for Filing Administrative Expenses.

The holder of an Administrative Expense, other than (1) a Fee Claim or (2) a Claim for ad valorem property taxes, must file with the Bankruptcy Court and serve on the Debtor and its counsel notice of such Administrative Expense within thirty (30) days of the occurrence of the Effective Date of the Plan. Such notice must include at a minimum: (1) the name of the holder of the Claim; (2) the amount of the Administrative Expense; and (3) the basis of the Administrative Expense. Failure to file and serve this notice timely and properly shall result in the Administrative Expense being forever barred and discharged. Notwithstanding any other provision of this Plan, all amounts due and owing for rent, storage, employee salaries, and other related business expenses incurred in the ordinary course of business and accruing during the pendency of the Bankruptcy Case will be paid in the ordinary course of business without the necessity of filing an Allowed Administrative Claim.

(b) Time for Filing Fee Claims.

Each Professional Person or other Person that holds or asserts an Administrative Expense that is a Fee Claim incurred before the Effective Date shall be required to file a Fee Application with the Bankruptcy Court, and serve on all parties required to receive notice, no later than sixty (60) days of the Effective Date. To the extent necessary, entry of the Confirmation Order shall amend and supersede any previously entered orders of the Bankruptcy Court regarding procedures for the payment of Fee Claims. Any objections to an application for the allowance of a Fee Claim must be filed with the Bankruptcy Court and served on the applicant within twenty-four (24) days after the date the Application was filed and served.

(c) Allowance of Administrative Expenses.

An Administrative Expense with respect to which notice has been properly filed pursuant to section 7.1(a) of the Plan shall become an Allowed Administrative Expense only to the extent Allowed by Final Order. An Administrative Expense that is a Fee Claim, and with respect to which a Fee Application has been properly

filed pursuant to section 7.1(b) of the Plan, shall become an Allowed Administrative Expense to the extent allowed by a Final Order.

## 7.2 Payment of Allowed Administrative Expenses.

Each holder of an Allowed Administrative Expense against the Debtor shall receive a Cash payment from the Reorganized Debtor in the amount of the unpaid portion of such Allowed Administrative Expense.. Payment of such Allowed Administrative Expenses could affect the ultimate distribution to Classes 5 and 6.

## 7.3 Treatment of Priority Tax Claims.

The IRS, as holder of an unclassified Allowed Priority Tax Claim against the Debtor, shall retain its full rights to the extent of its Allowed Priority Tax Claim until its Allowed Priority Tax Claim has been paid in full. The Allowed Priority Tax Claim of the IRS shall receive, in full satisfaction of such Claim, regular payments for the full amount of the IRS's Allowed Claim, payable in regular monthly Cash installments, in the amounts set forth in the attached Payment Schedule as exhibit "5."  The Debtor calculates that the foregoing payment schedule will result in payment of the tax portion of the Allowed Priority Tax Claim in full; *provided*, however, the final distribution required to fully satisfy the Allowed Priority Tax Claim may be more or less than the regular payment amount and need only be in such amount to complete the satisfaction of the tax portion of such Claim. The Debtor's Payment Schedule contemplates payment of the tax portion of the Allowed Priority Tax Claim of the IRS in seven (7) equal monthly installments beginning the month after the Effective Date.

The Debtor's Payment Schedule contemplates payment of the Allowed Priority Tax Claim of Gregg County on the Effective Date. The Debtor's Payment Schedule contemplates payment of the tax portion of the Allowed Priority Tax Claim of the IRS in seven (7) equal monthly installments beginning the month after the Effective Date.

Except as stated otherwise with respect to any particular claim, each holder of an Allowed Priority Tax Claim, shall receive, in full satisfaction of such holder's Allowed Priority Tax Claim, regular monthly Cash payments from the Reorganized Debtor to pay the full amount of such Allowed Priority Tax Claim, no later than five years after the Petition Date; provided, however, that any such claim holder may receive such other treatment as may be agreed upon in writing by the Debtor and the holder of such Allowed Priority Tax Claim.

## ARTICLE VII

## <u>CREATION OF REORGANIZED DEBTOR</u>

## 7.1 Creation of the Reorganized Debtor.

On the Effective Date, the Reorganized Debtor shall be created for the purpose of preserving and liquidating the Assets for the benefit of the Creditors and satisfying Claims consistent with the Plan. The Reorganized Debtor shall be entitled and authorized to engage in the

conduct of the trade or business of the Debtor solely to the extent reasonably necessary to, and consistent with, the distribution purposes of the Plan. The Reorganized Debtor shall receive any and all assets coming into or becoming a part of the Debtor's estate and disburse the proceeds from revenues realized from the operation, lease, assignment, sale or other similar transaction involving the property of the Reorganized Debtor consistent with the terms of this Plan and the OTA.

**7.2 Funding of the Reorganized Debtor.**

To fund the Reorganized Debtor, by operation of the Confirmation Order, the Reorganized Debtor shall be in possession of and have title to all pre-Closing receivables as of the Effective Date, including any cash, bank deposits, certificates of deposit, refunds, credits, recoupments, rights, contracts, claims and causes of action, garnishments, and all documents evidencing and relating to the ownership of such estate property. All accounts receivable of the Debtor shall be deemed, as of the Effective Date, to have been assigned to the Reorganized Debtor. The conveyances of all property of the Debtor's estates shall be accomplished pursuant to the Plan, which incorporates the PSA and the OTA and governed by the Confirmation Order and shall be effective upon the Effective Date without the need of further documentation or instruments of conveyance, other than the Plan, the Confirmation Order, the PSA, and the OTA. Upon the Effective Date, the Reorganized Debtor shall also be deemed to have taken (a) an assignment of all Estate Actions, and (b) an assignment, bill of sale, deed and/or release covering all remaining Assets discharged above. The Reorganized Debtor may present such orders as may be necessary to require third parties to accept and acknowledge such conveyance to the Reorganized Debtor. Such orders may be presented without further notice other than as has been given in this Plan.

**7.3 Name of Reorganized Debtor.**

The Reorganized Debtor shall retain the name "The Linderian Company, Ltd.," but may do business under any name the Reorganized Debtor deems advisable or which is necessary or appropriate and allowable by law, subject to the terms of the OTA.

## ARTICLE IX

## VESTING OF ASSETS AND OTA TRANSACTION

**8.1 Vesting in Reorganized Debtor**

On the Effective Date, subject to the PSA and the OTA, all property of the estates of the Debtor not transferred pursuant to the OTA, including but not limited to any and all rights, claims, causes of action, or Estate Actions, whether known or unknown, asserted or unasserted, at law or equity, and whether arising prepetition or postpetition, and whether arising pursuant to the Bankruptcy Code or other applicable law, including without limitation all rights, claims, or causes of action referenced within the body of, or exhibits attached to, the Plan, or the Debtor's Schedules or Statements of Financial Affairs, shall vest in the Reorganized Debtor free and clear of all Liens or encumbrances. To the extent any court of competent jurisdiction determines under applicable law that, notwithstanding the provisions of the Plan, a cause of action is not assignable, then any

assignment of such cause of action pursuant to the Plan shall be void *ab initio;* provided, however, that the proceeds of any such cause of action shall be transferred to the Reorganized Debtor upon receipt by the Debtor.

To the extent necessary or appropriate, the Reorganized Debtor may be substituted as the plaintiff or defendant in any or all lawsuits pending in which any Debtor is a plaintiff, defendant, or is seeking relief. The Reorganized Debtor shall be and hereby is appointed the sole corporate representatives of the Debtor for purposes of prosecuting any and all rights, claims, or causes of action, including but not limited to, all Estate Actions and actions arising pursuant to Chapter 5 of the Bankruptcy Code, whether known or unknown, asserted or unasserted, at law or equity, and whether arising pursuant to the Bankruptcy Code or other applicable law. The Reorganized Debtor may, in its sole discretion, prosecute, settle, or dismiss rights, claims, or causes of action, and all proceeds therefrom shall be property of the Reorganized Debtor.

## 8.2 The OTA Transaction

The Confirmation Order will provide for approval of the OTA, which shall be incorporated into the Plan. In the event of any conflict between the provisions of the Plan or other Plan Documents and the OTA, the provisions of the OTA shall control. As provided in the OTA, the Confirmation Order shall be in a form acceptable to the New Operator. The Confirmation Order will further provide as follows:

(a) On the Closing Date, as defined herein and in the OTA, all of the Debtor's right, title, and interest, in all property of the Debtor which the OTA provides shall be transferred or assigned to the New Operator pursuant to the OTA, shall be transferred to the New Operator pursuant to the terms of the OTA free and clear of any and all Liens, claims, or encumbrances.

(b) On the Closing Date, as defined herein and in the OTA all of the Debtor's right to operate the Facility shall transfer to the New Operator pursuant to the OTA and applicable law.

(c) On the Closing Date, as defined herein and in the OTA all of the Debtor's rights in and to all Designated Non-Executory Contracts (as defined in the OTA) shall be transferred to the New Operator pursuant to the terms of the OTA.

(d) New Operator shall have no liability for, does not assume, and shall not be deemed to assume, any debts, obligations, claims against, or other liabilities of Transferor of any form whatsoever whether liquidated or unliquidated, contingent or otherwise, known or unknown except as expressly stated herein, in the OTA, or in the Confirmation Order.

(e) The Creditors of the Debtor shall be enjoined and forever barred from recovering or seeking to recover from the New Operator or the Purchaser for any Claims or Administrative Expenses.

(f) If the OTA is terminated pursuant to its terms, neither Vista, the New Operator, nor the Purchaser shall have any further obligation to the Debtor, Reorganized Debtor, or the Debtor's estate except as expressly provided in the OTA on termination.

(g) In the event of any conflict between the provisions of the Plan or other Plan Documents and the OTA, the provisions of the OTA shall control.

## ARTICLE X

## <u>CORPORATE AUTHORITY</u>

All actions and transactions contemplated under the Plan, including the OTA and documents to be provided pursuant to the OTA, shall be authorized upon confirmation of the Plan without the need of further board, officer, or ownership resolutions, approval, notice, or meetings, other than the notice provided by serving this Plan on all known creditors of the Debtor, all equity Interest holders as of the entry of the order approving the Disclosure Statement, and all current members, officers, or management of the Debtor. The Confirmation Order shall include provisions authorizing and directing the president and secretary and other officers, managers, members, and authorized representative(s) of the Debtor to execute such documents as are necessary to effectuate the Plan, which documents shall be binding on the Debtor, the Debtor's Creditors, and all of the Debtor's equity Interest holders. Subject to the provisions of this Plan, the Reorganized Debtor is vested with authority to take any action on behalf of the Debtor that would otherwise require the approval of the members, managers, or officers of the Debtor.

The Reorganized Debtor's management and employees as of the Confirmation Date may be employed by the Reorganized Debtor at the same or similar rates and terms as existed during the pendency of the Bankruptcy Case. From and after the Effective Date, the existing managers and officers of the Debtor shall have no further duties or responsibilities with respect to the Debtor or the Reorganized Debtor, except to the extent employed by the Reorganized Debtor after the Effective Date. The Debtor's current managing partner and president, Greg Sechrist, shall retain and be granted all authority to execute any and all documents on behalf of the Reorganized Debtor.

## ARTICLE XI

## <u>DUTIES AND POWERS OF THE REORGANIZED DEBTOR</u>

## 11.1 The Reorganized Debtor's Duties

The Reorganized Debtor shall, subject to the PSA and OTA, operate in the ordinary course of business, sell, transfer, assign, convey, lease, use, or otherwise liquidate all property of the Reorganized Debtor, and use the proceeds thereof to pay (a) the Reorganized Debtor's administrative costs and expenses and (b) Allowed Administrative Expenses and Allowed Claims or Interests as designated within the Plan, unless the Reorganized Debtor deem any asset to be of inconsequential value or burdensome to the Reorganized Debtor. Further, the Reorganized Debtor may abandon any other asset (other than assets to be transferred pursuant to the OTA) within their reasonable business judgment. The proceeds of such liquidation shall be distributed as provided in

the Plan. Further, the proceeds of such liquidation shall, to the extent possible, be distributed in the same taxable year in which received or obtained by the Reorganized Debtor; provided, however, that the Reorganized Debtor may retain an amount of such funds as may be reasonably necessary to maintain the value of the Reorganized Debtor's Assets or to meet claims and contingent liabilities (including disputed claims). The Reorganized Debtor's efforts to liquidate Assets shall be continual so that they may make timely distribution to holders of Allowed Claims.

## 11.2 The Reorganized Debtor's Powers.

Subject to the terms of the Plan, the Reorganized Debtor shall have full power and authority, without further notice or Bankruptcy Court approval, to:

(a) Perfect and secure its rights, title, and interest to any property comprising the estate;

(b) Operate in the ordinary course of business for purposes of making distributions under the Plan;

(c) Sell or convert all assets of the estate to Cash and distribute the Net Proceeds pursuant to the Plan, subject to the terms otherwise set forth in the Plan or Confirmation Order (including the OTA as approved by the Confirmation Order);

(d) Settle or dismiss litigation claims that the Reorganized Debtor determines in their sole discretion should be settled, subject to the terms otherwise set forth in the Plan or Confirmation Order, including Article VII of the Plan;

(e) To contract and sell the Reorganized Debtor's estate or any part or parts thereof for such purchase price and for cash on such terms as the Reorganized Debtor shall deem appropriate, subject to the terms otherwise set forth in the Plan or Confirmation Order (including the OTA as approved by the Confirmation Order);

(f) Pay and discharge costs, expenses, or obligations deemed necessary to preserve the estate or any part thereof or to preserve the Reorganized Debtor;

(g) Improve or repair the Reorganized Debtor's properties or any parts thereof as may be necessary to effectuate the orderly liquidation thereof;

(h) Purchase insurance sufficient to protect fully the Reorganized Debtor's properties or any part or parts thereof and to protect such properties from liability;

(i) Maintain bank accounts in which Cash of the Reorganized Debtor is deposited;

(j) Draw checks and make disbursements;

(k) Employ such attorneys, accountants, appraisers, and any other professionals as are necessary in the administration of the Reorganized Debtor or for prosecution of litigation claims belonging to the Debtor, and to compensate the same from the Reorganized

Debtor's estate, which professionals may be professionals retained before the Effective Date by the Debtor; such expenses shall be paid without notice, Bankruptcy Court approval, or order;

(l) Employ auctioneers, brokers, and sales representatives;

(m) Take any action necessary to protect the Reorganized Debtor's estate or to increase the value of the Reorganized Debtor's assets;

(n) Enter into contracts and execute negotiable and non-negotiable obligations;

(o) Sue and be sued;

(p) Appoint, remove, and act through agents, managers, and employees, and confer upon them such power and authority as may be necessary or advisable;

(q) Review and determine the allowance of Claims or Interests and file objections to any Claim or Interest that the Reorganized Debtor disputes;

(r) Seek the valuation of assets by appraisers, valuation experts, or by the Bankruptcy Court;

(s) Borrow money pursuant to the terms of the Plan;

(t) Withhold employment and income taxes, or other taxes as is appropriate;

(u) Prosecute to final judgment all litigation of the Reorganized Debtor's Claims and Estate Actions. The Reorganized Debtor may also bring or defend those appeals of litigation claims if it determines that doing so is in the best interest of the estate; and

(v) Take such other actions, as may be necessary or helpful to consummate the Plan.

## 11.3 Management of Estate.

The Reorganized Debtor shall have such other or additional powers as may be vested in or assumed by the Reorganized Debtor pursuant to the Plan or any Bankruptcy Court order or as may be necessary and proper to carry out the provisions of the Plan. The Reorganized Debtor shall exercise such powers in accordance with the provisions of the Plan. The Debtor's current managing partner and president, Greg Sechrist, shall retain and be granted all authority to execute any and all documents on behalf of the Reorganized Debtor

## 11.4 Maintenance of Records.

On and after the Effective Date, the Reorganized Debtor shall have complete and exclusive access to, and control of, all books and records of the Debtor, subject to the terms of the OTA and the provisions therein transferring certain books or records to New Operator. The Debtor, any

management personnel, brokers, appraisers, and other professionals shall immediately surrender all such books and records to the Reorganized Debtor on the Effective Date to the extent requested by the Debtor. The Reorganized Debtor shall keep or cause to be kept books containing a description of all property from time to time constituting the estate and an accounting of all receipts and disbursements of Reorganized Debtor's property or the proceeds thereof.

## ARTICLE XII

## PROCEDURES GOVERNING DISTRIBUTIONS AND FOR RESOLVING AND TREATING CONTESTED AND DISPUTED CLAIMS UNDER THE PLAN

**12.1 Order of Distribution of Cash.**

The Reorganized Debtor shall distribute or reserve available Cash of the estate in the following order of priority:

(a) Any Cash or other property that is subject to the valid Lien and Allowed Claim of a Secured Creditor shall be distributed to the holders of the Allowed Secured Claims pursuant to Article IV of the Plan;

(b) To pay Allowed Administrative Expense Claims pursuant to Article V of the Plan, to the extent not satisfied by funds escrowed by the Debtors as of the Effective Date;

(c) To pay the post-confirmation expenses of the Reorganized Debtor for preserving, liquidating, and administering the remaining estate Assets and collecting the Estate's outstanding receivables and Estate Actions;

(d) To pay Allowed Priority Tax Claims and Allowed Priority Unsecured Claims pursuant to the Plan, in the order of priority prescribed by the Bankruptcy Code section 507(a) as applicable to such Allowed Claims;

(e) To pay Allowed General Unsecured Claims and Allowed General Unsecured Guaranteed Claims pursuant to the Plan.

**12.2 Timing of Distributions.**

The Reorganized Debtor shall make all payments timely as expressly required by the Plan. Otherwise, distributions to Creditors shall be made by the Reorganized Debtor each time it has accumulated sufficient funds to merit a distribution as called for by the Plan, considering the number of Creditors and dollar amount of their Allowed Claims, or when the Reorganized Debtor has determined that no additional funds are likely to be collected.

**12.3 Distributions to be Pro Rata Within Class.**

All distributions constituting partial payment to a Class of Allowed Claims shall be made on a Pro Rata Share basis to the holders of Allowed Claims in such Class.

**12.4 Federal Tax Identification Number.**

The Reorganized Debtor may suspend distribution to any Creditor that has not provided the Reorganized Debtor with their Federal Tax Identification number or social security number, as the case may be.

**12.5 Means of Cash Payment.**

Cash payments made pursuant to the Plan shall be in U.S. funds, by check drawn on a domestic bank, or, at the Reorganized Debtor's option, by wire transfer from a domestic bank.

**12.6 Delivery of Distributions.**

Distributions to holders of Allowed Claims shall be made at the address of each such holder as set forth on the proof of Claim filed by such holders (or at the last known addresses of such a holder if no proof of Claim or proof or equity Interest is filed or if the Reorganized Debtor has been notified in writing of a change of address), except as provided below. If any holder's distribution is returned as undeliverable, no further distributions to such holder shall be made unless and until the Reorganized Debtor is notified in writing of such holder's then current address, at which time all missed distributions shall be made to such holder without interest. Amounts in respect of undeliverable distributions shall be returned to the Reorganized Debtor until such distributions are claimed. All claims for undeliverable distributions shall be made on or before the first anniversary date of such distribution. After such date, all unclaimed property shall revert to the Reorganized Debtor, and the claim of any holder with respect to such property shall be discharged and forever barred.

**12.7 Time Bar to Cash Payments.**

Checks issued by the Reorganized Debtor in respect of Allowed Claims shall be null and void if not negotiated within six (6) months after the date of issuance thereof. Requests for reissuance of any such voided check shall be made in writing directly to the Reorganized Debtor by the holder of the Allowed Claim with respect to which such check originally was issued. Any such request for reissuance shall be made on or before ninety (90) days after such check became null and void. After such date, all claims in respect to voided checks shall be discharged and forever barred.

**12.8 No Distributions Pending Allowance.**

Notwithstanding any other provision of the Plan, no payment or distribution shall be made with respect to any Claim to the extent it is a Contested Claim unless and until such Contested Claim becomes an Allowed Claim.

**12.9 Objection Deadline.**

As soon as practicable, but in no event later than three (3) months after the Effective Date, unless extended by order of the Bankruptcy Court, objections to Claims shall be filed with the Bankruptcy Court and served upon each holder of each Claim to which an objection is filed.

**12.10 Prosecution of Objections.**

On and after the Effective Date, except as the Bankruptcy Court may otherwise order, the filing, litigation, settlement, or withdrawal of all objections to Contested Claims may be made by the Reorganized Debtor. Any party-in- interest may seek authority from the Court to file a claim objection(s) upon (i) making written demand on the Reorganized Debtor; (ii) failure to bring such claim objection(s) by the Reorganized Debtor within thirty (30) days of receipt of the written demand; and (iii) upon order of this Court after a hearing and at least twenty-one (21) days' notice to the Reorganized Debtor.

**12.11 Withholding of Distribution on Account of Contested Claims.**

The Reorganized Debtor shall withhold from any distribution an amount sufficient to be distributed on account of the full amount of Contested Claims (the "Withheld Distribution Amount"). The Withheld Distribution Amount shall be placed in the Contested Claims Escrow held by the Reorganized Debtor. To the extent requested by the Reorganized Debtor or the holder of the Contested Claim, the Bankruptcy Court may estimate (upon proper notice and an opportunity for hearing to the holder of the Contested Claim) the amount to be placed in escrow (the "Contested Claims Escrow") on account of any Contested Claim, which amount need not be the full amount of the asserted Claim.

**12.12 Distributions After Allowance.**

Payments and distributions to each holder of a Contested Claim, to the extent that such Claim ultimately becomes an Allowed Claim, shall be made in accordance with the provisions of the Plan governing the class of Claims to which the respective holder belongs. With respect to any Claim that is a Contested Claim on the Effective Date, as soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing such Contested Claim becomes a Final Order, the Reorganized Debtor shall distribute to the holder of such Claim from the Contested Claims Escrow any distribution that would have been distributed to such holder if the Claim had been an Allowed Claim on the Effective Date.

**12.13 Distributions After Disallowance.**

Any Withheld Distribution Amount in the Contested Claims Escrow after an objection to a Contested Claim has been resolved by Final Order of the Bankruptcy Court shall be distributed in accordance with the provisions of the Plan. The Reorganized Debtor may and shall rely on an order of the Bankruptcy Court fixing the amount of a Claim or disallowing a Claim. The Reorganized Debtor shall make no further reserve on account of a Contested Claim that has been

disallowed or reduced by the Bankruptcy Court, unless the affected Creditor obtains a stay pending appeal that requires that the Reorganized Debtor maintain a reserve on account of such Claim. In no event shall the reversal or modification on appeal or reconsideration of a Bankruptcy Court order disallowing a Claim affect the validity or require the disgorgement of any distributions previously made pursuant to the Plan if such Creditor did not obtain a stay pending reconsideration or appeal that required a further or continuous reserve.

## 12.14 Estimated Claims.

Except as otherwise provided herein, the Court may estimate for purposes of allowance pursuant to section 502(c) of the Bankruptcy Code, (i) any Contested Claim or unliquidated Claim, or (ii) any portion or part of a Claim that is, itself, unliquidated. Any Estimation Order, to the extent it becomes a Final Order, shall determine the amount of the Allowed Claim so estimated.

## 12.15 Deficiency Claims.

Except as otherwise provided in the Plan or in any other Final Order of the Court, in the event of Debtor's return of collateral, the holder of Secured Non-Tax Claims, shall have thirty (30) days from the earlier of (a) the date that Debtor return to such holder the Collateral securing such holder's claim, or (b) the date of entry of a Final Order of the Court lifting the automatic stay and authorizing Debtor to return to such holder the Collateral securing such holder's claim, to file a proof of claim for any resulting unsecured deficiency claim, including all fees and costs associated with liquidation of the Collateral under applicable law, against the estate resulting from the liquidation of the Collateral. A deficiency proof of claim filed as described herein shall receive the treatment provided for Class 5 as described in Article IV of the Plan.

## 12.16 Bankruptcy Court to Hear Disputes Over Distributions and Plan Issues.

No entity or holder of a Claim or an Interest, and no representative thereof, shall have or pursue any claim or cause of action (a) against the Debtor, Reorganized Debtor, or their Representatives for making payments or taking any action in accordance with the Plan or for implementing the provisions of the Plan or (b) against any holder of a Claim for receiving or retaining payments or other distributions as provided for in the Plan, except as may be brought before this Bankruptcy Court after filing and service with appropriate and reasonable notice.

## ARTICLE XIII

## PROVISIONS REGARDING EXECUTORY CONTRACTS AND UNEXPIRED LEASES UNDER THE PLAN

## 13.1 Assumption.

The Plan constitutes a motion by the Debtor to assume as of the Effective Date, all executory contracts, and unexpired leases of the Debtor that (a) were not the subject of a separate motion to assume or reject pending on the Confirmation Date, (b) were not assumed or rejected prior, (c) did not expire on their own terms prior to the Effective Date, or (d) are listed for

assumption on Exhibit "8," attached hereto.. The contracts listed on the attached Exhibit "8" shall be assumed by the Debtor until terminated by the parties.

The Debtor believes the Provider and Private Pay Contracts described on Exhibit "8" are essential assets of the estate under section 541 of the Bankruptcy Code, however, out of an abundance of caution, and in accordance with guidance from the HHSC, the Debtor is moving for assumption of same under section 365 of the Bankruptcy Code under this Plan until the contract parties terminate such contracts.

Under the Plan, the Debtor also is assuming its contract with Curtis | Law PC and its attorneys, which were utilized postpetition by the Debtor in the Bankruptcy Case. No other pre-petition contracts with Professional Persons are assumed and/or cured by the Plan other than as expressly set forth in this subparagraph.

The Debtor, through the Plan, is moving to reject each of the following prepetition contracts (provided that the Debtor may, at any time prior to the Confirmation Hearing, revise the following list in a supplement to the Plan) as listed on Schedule G of its Schedules, and as such the following are deemed rejected by the Debtor as of the Effective Date, or upon Closing:

| Contract Party | Contract Description |
|---|---|
| Atmos Energy | Natural Gas Provider |
| Cablelynx | Phone Provider |
| City of Longview | Water and Sewer Services |
| Shefa Healthcare Lease | Lease of building |
| Conterra Networks | Network Communications |
| Republic Services | Waste Disposal |
| RetirementHome TV Corporation | TV for Residents |
| SWEPCO | Electricity Provider |

Under the Plan, the Debtor also is assuming its contract with Curtis | Law PC and its attorneys, which were utilized postpetition by the Debtor in the Bankruptcy Case. No other pre-petition contracts with Professional Persons are assumed and/or cured by the Plan other than as expressly set forth in this subparagraph.

**13.2 Assumption and Assignment of Executory Contracts to New Operator**

The Plan constitutes a motion by the Debtor to assume, and assign to New Operator, as of the Closing Date and conditioned on occurrence of the Closing as defined in the OTA, the following contracts. Entry of the Confirmation Order shall constitute approval, pursuant to §§ 365(a),(f) of the Bankruptcy Code, for the assumption and assignment of the executory contracts to be assumed and assigned pursuant to the provisions of this section.

(a) The Care Agreements (as defined in the OTA) pertaining to active residents of the Facility as of the Closing Date, which shall be assumed and assigned pursuant to the terms of the OTA.

(b) The Designated Executory Contracts (as defined in the OTA, and together with the Care Agreements, the "Assigned Executory Contracts") which the New Operator desires in its sole discretion to assume as of the Closing Date, which Designated Executory Contracts shall be set forth in a supplement to this Plan (the "Assigned Executory Contract Notice") which shall be filed by the Debtor, and served on all counterparties to such contracts. The Assigned Executory Contract Notice may be amended by the Debtor, with the consent of the New Operator, at any time prior to Confirmation.

Assigned Executory Contracts shall be assumed by the Debtor and assigned to the New Operator as of the Closing Date, and effective only on Closing, pursuant to the Chapter 11 Plan, Confirmation Order, and 11 U.S.C. §§ 365 and 1123. All timely asserted "cure" costs required for assumption and assignment of Assigned Executory Contracts shall be paid by the Debtor.

As to each of the above-listed contracts, unless a cure demand is presented in writing at or before the date first set for the Confirmation Hearing, the cure amounts specified in the Assigned Executory Contract Notice shall govern. Unless a cure amount is specified herein or in the Assigned Executory Contract Notice, the Debtors contend that no cure payment is required in order to assume the contract. If a counter-party asserts that a cure amount other than the amount set forth is required, it must assert the right to a cure payment by presenting a cure demand not later the date first set for hearing on Confirmation. All timely asserted "cure" costs required for assumption and assignment of Assigned Executory Contracts shall be paid by the Debtor. Unless a cure demand is timely presented, the counter-party to any Assigned Executory Contract shall be forever barred from asserting against the New Operator any default or amount due arising under such contract prior to the Confirmation Date.

**13.3 Bar to Rejection Claims.**

If the rejection of an executory contract or unexpired lease results in a claim for damages by the other party or parties thereto, a Claim for such damages, if not heretofore evidenced by a filed proof of Claim, shall be forever barred and shall not be enforceable against the Debtor, the Reorganized Debtor, or their respective properties or their agents, successors or assigns, unless a proof of Claim is filed with the Bankruptcy Court and served upon counsel for the Debtor on or before thirty (30) days after the Effective Date.

# ARTICLE XIV

## CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

**14.1 Conditions Precedent to the Effective Date.**

The occurrence of the Effective Date of the Plan is subject to the occurrence of the following conditions precedent:

(a) All documents effectuating the Plan, including the PSA and OTA, shall have been executed and delivered by the parties thereto, and all conditions to the effectiveness of such documents shall have been satisfied or waived as provided therein;

(b) Debtor shall have escrowed, in the trust account of its undersigned bankruptcy counsel or otherwise, an amount necessary to satisfy all accrued, anticipated, and requested fees and expenses of the U.S. Trustee and all Professional Persons as of the anticipated Effective Date;

(c) The Confirmation Order shall have become a Final Order or shall not be stayed by a court of competent jurisdiction; and

(d) All conditions necessary for the Closing of the OTA and PSA to occur on the Effective Date shall have been satisfied.

**14.2 Waiver of Conditions.**

The conditions to the Effective Date may be waived, in whole or in part by the Debtor, upon written approval of Debtor's counsel, at any time, without notice, provided that the foregoing shall not modify the provisions of the OTA regarding waiver of conditions to Closing. The failure to satisfy or waive any condition may be asserted by the Debtor regardless of the circumstances giving rise to the failure (including any actions or inaction by the Debtor). The failure of the Debtor to exercise any of the foregoing rights shall not be deemed a waiver of any other rights and each right shall be deemed an ongoing right that may be asserted at any time.

# ARTICLE XV

## RETENTION OF JURISDICTION

**15.1 Scope of Jurisdiction.**

Notwithstanding the entry of the Confirmation Order or the occurrence of the Effective Date, pursuant to sections 1334 and 157 of title 28 of the United States Code, the Bankruptcy Court shall retain and have jurisdiction over all matters arising in, arising under, or related to the Bankruptcy Case and the Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code and for, among other things, the following purposes:

(a) To hear and determine pending motions for the assumption or rejection of Contracts, and the allowance of Claims resulting therefrom.

(b) To hear and determine any and all adversary proceedings, applications, and contested matters, including any remands of appeals;

(c) To ensure that distributions to holders of Allowed Claims are accomplished as provided herein;

(d) To hear and determine any timely objections to or applications concerning Claims or the allowance, classification, priority, estimation, or payment of any Claim or equity Interest;

(e) To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, reversed, or vacated;

(f) To enter and implement such orders as may be necessary or appropriate to execute, interpret, implement, consummate, or enforce the Plan and the transactions contemplated thereunder, the Confirmation Order, any transactions or payments contemplated hereby, or any agreement, instrument, or other document governing or relating to any of the foregoing;

(g) To consider any modification of the Plan pursuant to section 1127 of the Bankruptcy Code, and to cure any defect or omission or to reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(h) To hear and determine all applications for the allowance of Administrative Expenses, including all Fee Applications and Fee Claims and any objections thereto;

(i) To hear and determine disputes arising in connection with the execution, interpretation, implementation, consummation, or enforcement of the Plan;

(j) To enter and implement orders to take such other actions as may be necessary or appropriate to restrain interference by any Person with the consummation or implementation of the Plan, including, without limitation, to issue, administer, and enforce injunctions provided for in the Plan and the Confirmation Order;

(k) To recover all assets of the Debtor and property of the estate, wherever located;

(l) To hear and determine matters concerning state, local, and federal income taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(m) To hear and determine any other matter not inconsistent with the Bankruptcy Code and title 28 of the United States Code that may arise in connection with or related to the Plan;

(n) To hear and determine all actions commenced or prosecuted by the Reorganized Debtors

pursuant to sections 505, 510, 542-45, 547-50, and 553 of the Bankruptcy Code, collection matters related thereto, and settlements thereof;

(o) To hear and determine any disputes concerning Contested Claims;

(p) To hear and determine any disputes concerning the validity or priority of Liens against the Collateral securing or purporting to secure any Secured Claim; and

(q) To enter a Final Decree closing the Bankruptcy Case. Notwithstanding the foregoing language in this subsection, the Plan does not request, and the Court Order shall not grant the Bankruptcy Court any constitutional authority or jurisdiction beyond the scope allowed by *Stern v. Marshall*, 131 S. Ct. 2594 (2011) and *Wellness Int'l Network v. Sharif*, 135 S. Ct. 1932 (2015).

**15.2 Failure of the Bankruptcy Court to Exercise Jurisdiction.**

If the Bankruptcy Court abstains from exercising jurisdiction, declines to exercise jurisdiction, or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Bankruptcy Case, this Article XIII shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having jurisdiction with respect to such matter.

## ARTICLE XVI

## <u>MISCELLANEOUS PROVISIONS</u>

**16.1 Setoff and Other Rights.**

In the event that the Debtor have a claim of any nature whatsoever against the holder of a Claim, the Debtor or the Reorganized Debtor may, but are not required to, setoff against the Claim (and any payments or other distributions to be made in respect to such Claim hereunder), subject to the provisions of section 553 of the Bankruptcy Code. Neither the failure to setoff nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Debtor or the Reorganized Debtor of any claim the Debtor or the Reorganized Debtor have against the holder of a Claim.

**16.2 Discharge.**

If the Plan is confirmed under § 1191(a), on the Confirmation Date of this Plan, the Debtor will be discharged from any debt that arose before confirmation of this Plan, subject to the occurrence of the Effective Date, to the extent specified in § 1141(d) of the Bankruptcy Code; or if the Plan is confirmed under § 1191(b), as soon as practicable after completion by the Debtor of all payments due under the Plan, unless the Court approves a written waiver of discharge executed by the Debtor after the order for relief under this chapter, the Court shall grant the Debtor a discharge of all debts provided in section 1141(d)(1)(A) of this title, and all other debts allowed under section 503 of this title and provided for in this Plan, except any debt— (1) on which the last payment is due after the first 3 years of the plan, or such other time not to exceed 5 years fixed by the Court; or (2) if applicable, of the kind specified in section 523(a) of this title.

**DEBTOR'S PLAN OF REORGANIZATION**

Except as otherwise expressly provided in the Plan, the rights and treatment afforded in the Plan shall discharge all existing security interests, liens, debts, and Claims of any kind, nature, or description whatsoever against the Debtor or any of their assets or properties to the fullest extent permitted by section 1141 of the Bankruptcy Code; upon the Effective Date, all existing Claims against the Debtor shall be, and shall be deemed to be, discharged, and all holders of Claims shall be precluded from asserting against the Debtor, or any of their assets or properties, any other or further Claim based upon any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date, whether or not such holder filed a proof of Claim. Confirmation of the Plan and the obligations imposed on the Debtor and/or the Reorganized Debtor herein shall be in complete satisfaction, discharge, and release of all Claims of any nature whatsoever against the Debtor and/or the Reorganized Debtor or any of their assets or properties; and, upon the Effective Date, the Debtor shall be deemed discharged, and released from any and all Claims, including but not limited to demands and liabilities that arose before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code that arose before the Effective Date, whether or not (a) a proof of Claim based upon such debt is filed or deemed filed under section 501 of the Bankruptcy Code, (b) a Claim based upon such debt is Allowed under section 502 of the Bankruptcy Code, or (c) the holder of a Claim based upon such debt has accepted the Plan. Except as provided herein, the Confirmation Order shall be a judicial determination of discharge of all liabilities of the Debtor. As provided in section 524 of the Bankruptcy Code, such discharge shall void any judgment against the Debtor at any time obtained, to the extent it relates to a Claim discharged and operates as an injunction against the prosecution of any action against the Debtor, or their property, to the extent it relates to a Claim discharged. The discharge granted herein shall not discharge the Reorganized Debtor from its obligations under the Plan.

## 16.3 Injunctions.

*The Confirmation Order shall contain such injunctions as may be necessary or helpful to effectuate the effectiveness of the Debtor's Plan provided herein. Without limiting the generality of the foregoing, such injunction shall include an absolute prohibition from pursuing or collecting Claims against the Debtor in any manner other than as provided for in the Plan, including any trust fund liabilities, constructive trusts, statutory trusts, or liabilities arising from contribution, subrogation, warranty, indemnification or guarantee agreements of the Debtor, or any foreclosure action by any Lien creditors. These injunctions shall not prevent creditors from enforcing their rights under the Plan, and may be lifted by the Court upon motion filed after notice and a hearing given in the event of an uncured Debtor's default as set forth in the Plan.*

## 16.4 Injunction Regarding Claims Against the Debtor.

*From and after the Confirmation Date, all persons or entities that hold, have held, or may hold Claims against or Interests in the Debtor are permanently restrained and enjoined from, directly or indirectly:*

*(a) Commencing or continuing in any manner any action or other proceeding of any kind against the Debtor or the Reorganized Debtor, or Assets of the Debtor to collect or recover any property on account of any such Claim or Interest;*

*(b) Enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order to collect or recover any property on account of any such Claim or Interest against the Debtor or the Reorganized Debtor, or Assets of the Debtor;*

*(c) Creating, perfecting, or enforcing any Lien or encumbrance of any kind against the Debtor or the Reorganized Debtor, or the Assets of the Debtor;*

*(d) Asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due the Debtor or the Reorganized Debtor, or the Assets of the Debtor, except as otherwise allowed by the Bankruptcy Court or Bankruptcy Code;*

*(e) Commencing or continuing any action against the Debtors or the Reorganized Debtor, or the Assets of the Debtor in any manner or forum in respect of such Claim or Interest that does not conform to or comply with or that is inconsistent with the Plan; and*

*(f) Taking any action to interfere with the implementation or consummation of the Plan.*

Notwithstanding the foregoing, however, nothing herein shall prohibit any holder of a Claim or Interest from prosecuting a proof of Claim or Interest in the Bankruptcy Case or from enforcing such holder's rights under the Plan.

## 16.5 Channeling Injunction.

*The Bankruptcy Court shall retain exclusive jurisdiction over any case, suit, or proceeding brought on any claim or cause of action related to the Bankruptcy Case that exists as of the Effective Date against Debtor, Reorganized Debtor, or any Representative for conduct pertaining to Debtor during the Bankruptcy Case and that any entity wishing to bring such case, suit, or proceeding shall do so in the Bankruptcy Court. Additionally, nothing herein shall limit or affect the protections provided Debtor and Reorganized Debtor by sections 524 and 1141 of the Bankruptcy Code.*

## 16.6 Lawsuits.

Upon entry of the Confirmation Order, all lawsuits, litigation, administrative, police, or regulatory actions, or other proceedings, judicial or administrative, in connection with the assertion of a Claim or Lien against the Debtor or property of the Debtor's estates shall be subject to the discharge and any other injunctions set forth in the Bankruptcy Code or the Court's Confirmation Order. Such discharge injunctions shall be with prejudice to the assertion of such Claim or Lien in any manner other than as prescribed by the Plan. All parties to any such action shall be enjoined by the Bankruptcy Court in the Confirmation Order from taking any action in violation of the Bankruptcy Code or the Confirmation Order. All lawsuits, litigation, administrative, police, or regulatory actions, or any other proceedings, judicial or administrative, in connection with the assertion of any Claims by the Debtor shall become property for the Reorganized Debtor to

prosecute, settle, or dismiss as the Reorganized Debtor see fit, subject to the express terms of this Plan.

### 16.7 Insurance.

Confirmation and consummation of the Plan shall have no effect on insurance policies of the Debtor in which the Debtor's is or was the insured party. The Reorganized Debtor shall become the insured party under any such policies without the need of further documentation other than the Plan and entry of the Confirmation Order. Each insurance company is prohibited from, and the Confirmation Order shall include an injunction against, denying, refusing, altering, or delaying coverage on any basis regarding or related to the Debtor's bankruptcy, the Plan, or any provision within the Plan.

### 16.8 De Minimis Distributions.

No distribution of less than $50.00 shall be required to be made to any holder of an Allowed Claim. Such undistributed amount may be retained by the Reorganized Debtor.

### 16.9 Payment of Statutory Fees.

All fees payable pursuant to section 1930 of title 28 of the United States Code shall be paid through the entry of a final decree in the Bankruptcy Case.

### 16.10 Bankruptcy Restrictions.

From and after the Effective Date, the Reorganized Debtor shall no longer be subject to the restrictions and controls provided by the Bankruptcy Code or Rules (e.g., section 363, 364, Rule 9019, etc.), the Bankruptcy Court, or the United States Trustee's guidelines. The Reorganized Debtor may compromise claims and controversies post-Effective Date without the need of notice or Bankruptcy Court approval for any settlements. The Reorganized Debtor may operate the Debtor's business in such manner as is consistent with companies not in bankruptcy without the need of seeking Bankruptcy Court approval with regard to any aspect of the Reorganized Debtor's business. No monthly operating reports will be filed after the Effective Date; however, the Reorganized Debtor shall provide, until the entry of a final decree, quarterly operating reports or such other financial reports as the U.S. Trustee may reasonably request.

### 16.11 Binding Effect.

The Plan shall be binding upon and inure to the benefit of the Debtor, the holders of Claims, the holders of Interests, the Reorganized Debtor, and all of their respective successors and assigns; provided, however, that if the Plan is not confirmed, the Plan shall be deemed null and void and nothing contained herein shall be deemed (a) to constitute a waiver or release of any Claims by the Debtor or any other Person, (b) to prejudice in any manner the rights of the Debtor or any other Person or (c) to constitute any admission by the Debtor or any other Person.

### 16.12 Governing Law.

Unless a rule of law or procedure is supplied by contract or by federal law (including the Bankruptcy Code and Bankruptcy Rules) or the law of the jurisdiction of organization of any entity, the laws of the State of Texas shall govern the construction and implementation of the Plan and any agreements, documents, and instruments executed in connection with the Plan or the Bankruptcy Case, including the documents executed pursuant to the Plan.

## 16.13 Modification of Plan.

Modifications of the Plan may be proposed in writing by the Debtor at any time before the Confirmation Date, provided that (a) the Plan, as modified, meets the requirements of sections 1122 and 1123 of the Bankruptcy Code and (b) the Debtor shall have complied with section 1125 of the Bankruptcy Code. The Plan may be modified at any time after the Confirmation Date and before substantial consummation by the Debtor, provided that (a) the Plan, as modified, meets the requirements of sections 1122 and 1123 of the Bankruptcy Code, (b) the Bankruptcy Court, after notice and a hearing, confirms the Plan as modified, under section 1129 of the Bankruptcy Code and (c) the circumstances warrant such modifications. A holder of a Claim or equity Interest that has accepted or rejected the Plan shall be deemed to have accepted or rejected, as the case may be, such Plan as modified, unless, within the time fixed by the Bankruptcy Court, such holder changes its previous acceptance or rejection.

## 16.14 Revocation or Withdrawal of this Plan.

(a) The Debtor reserves the right to modify, amend, supplement, revoke, and/or withdraw this Plan at any time prior to the Confirmation Date.

(b) If the Debtor revokes or withdraws the Plan, the Plan shall be deemed null and void. In such event, nothing contained herein shall be deemed to constitute a waiver or release of any claims by or against the Debtor or any other Person or to prejudice in any manner the rights of the Debtor or any Person in any further proceedings involving the Debtor.

## 16.15 Severability.

Should the Bankruptcy Court determine that any provision of the Plan is unenforceable either on its face or as applied to any Claim or Interest or transaction, the Debtor may modify the Plan in accordance with section 14.13 of the Plan so that such provision shall not be applicable to the holder of any Claim or equity Interest. At the option of the Debtor, such a determination of unenforceability shall not (a) limit or affect the enforceability and operative effect of any other provision of the Plan or (b) require the resolicitation of any acceptance or rejection of the Plan.

## 16.16 Creditor and Debtor Defaults.

Except as to any default of the Debtor as to any obligation to the IRS as provided below, any act or omission by a creditor in contravention of a provision within this Plan shall be deemed an event of default under this Plan. Upon an event of default that remains uncured after notice and opportunity to cure, sufficient under the circumstances, the Reorganized Debtor may seek to hold

the defaulting party in contempt of the Confirmation Order. If such creditor is found to be in default under the Plan, such party may be required to pay the reasonable attorneys' fees and costs of the Reorganized Debtor in pursuing such matter. Furthermore, upon the finding of such a default by a creditor, the Bankruptcy Court may (a) designate a party to appear, sign and/or accept the documents required under the Plan on behalf of the defaulting party, in accordance with Rule 70 of the Federal Rules of Civil Procedure, or (b) issue and enter such other order as may be equitable which does not materially alter the terms of the Plan as confirmed.

In the event that the holder of an Allowed Claim asserts that a default under the Plan has occurred by the Reorganized Debtor, such person must provide the Reorganized Debtor and their counsel with written notice of such default and a reasonable opportunity to cure. If the default asserted in the notice remains uncured on the thirtieth (30th) day from the date on which such notice is received, the holder of such Allowed Claim may pursue any rights or remedies it may have under the Plan, applicable non-bankruptcy law, whether state, federal, or otherwise, including in the Bankruptcy Court.

**Debtor Default as to the Allowed Claims of the IRS.** Notwithstanding the foregoing paragraphs in this section, the following terms shall govern payment default on the IRS's Allowed Claims.

**Events of Default.** The occurrence of any of the following shall constitute an event of default under the Plan as to the Allowed Claims of the IRS:

1) **Failure to Make Payments.** Failure on the part of Debtors to pay fully when due any payment required to be made in respect of the Plan debt. However, due to the size and ongoing nature of the IRS's claim, upon a default under the plan, the administrative collection powers and the rights of the IRS shall be reinstated as they existed prior to the filing of the bankruptcy petition, including, but not limited to, the assessment of taxes, the filing of a notice of Federal (or state) tax lien and the powers of levy, seizure, and as provided under the Internal Revenue Code.

As to the IRS:

(A) If the Debtors or their successor in interest fails to make any plan payments, or deposits of any currently accruing employment or sales tax liability; or fails to make payment of any tax to the Internal Revenue Service within 10 days of the due date of such deposit or payment, or if the Debtors or their successor in interest failed to file any required federal or state tax return by the due date of such return, then the United States may declare that the Debtors are in default of the Plan. Failure to declare a default does not constitute a waiver by the United States of the right to declare that the successor in interest or Debtors are in default.

(B) If the United States declares the Debtors or their successor in interest to be in default of the Debtors' obligations under the Plan, then the entire imposed liability, together with any unpaid current liabilities, may become due and payable immediately upon written demand to the Debtors or their successor in interest.

(C) If full payment is not made within 14 days of such demand, then the Internal Revenue Service may collect any unpaid liabilities through the administrative collection provisions of the Internal Revenue Code. The IRS shall only be required to send one notice of default, and upon the second event of Default the IRS may proceed to collect on all amounts owed without recourse to the Bankruptcy Court and without further notice to the Debtors. The collection statute expiration date will be extended from the Petition Date until substantial default under the Plan. All payments will be sent to: IRS, 1100 Commerce Street, Mail Code 5025 DAL, Dallas, Texas 75242 attn: Mikeal Smith.

(D) The Internal Revenue Service shall not be bound by any release provisions in the Plan that would release any liability of the responsible persons of the Debtors to the IRS. The Internal Revenue Service may take such actions as it deems necessary to assess any liability that may be due and owing by the responsible persons of the Debtors to the Internal Revenue Service; but the Internal Revenue Service shall not take action to actually collect from such persons unless and until there is a default under the Plan and as set forth above.

Nothing in the foregoing shall permit the IRS to recover from the New Operator or Purchaser any obligations of the Debtor or Reorganized Debtor under the Plan or otherwise, including through setoff of amounts payable under the CMS Provider Agreements for dates of service after the Closing Date.

### 16.17 Retention of Causes of Action.

The Reorganized Debtors shall retain, all rights, claims, defenses, and causes of action including, but not limited to, the Estate Actions, and shall have sole authority to prosecute and/or settle such actions without approval of the Bankruptcy Court under Bankruptcy Rule 9019 or otherwise. Without limitation, the Reorganized Debtors intend to preserve, and to not waive or release in any way, any and all Estate Actions, including for avoidance and recovery under sections 544, 547, 548, and 550 of the bankruptcy code and Texas Uniform Fraudulent Transfer Act.

### 16.18 Closing the Case.

Upon the Plan being substantially consummated and upon motion by the Reorganized Debtors, a final decree shall be entered containing such provisions as may be equitable. The Bankruptcy Court may close the case, but may retain jurisdiction thereafter to the extent allowed by law, and/or may reopen the case under section 350 of the Bankruptcy Code.


**DATED: August 27, 2022**

**The Linderian Company, Ltd.**

**By: Greg Sechrist**
**Its: Managing Partner**


**DEBTOR'S PLAN OF REORGANIZATION**                                      Page **43** of 43